May it please the Court. My name is Carl Anuta. With me at council table is Mr. David Becker and we're the attorneys for the appellants in this case, Craw and Ms. Sarah Meyer. And I'm going to try to reserve five minutes for rebuttal. All right. This case is about whether, despite the requirements of the Clean Water Act and NEPA, a federal agency can legally cut and paste from letters or statements by an applicant and call it good. That's really what it comes down to. The agency is required to By the way, you know, before I forget and before you go on, why isn't this case moot now since the project's been completed? The store's been open, right? The store is not yet open, Your Honor. Open in early June. It's supposed to be open in June. The project is not moot because, as we indicated in our supplemental authority submission, there is still relief that can be granted here. Like what, for instance? Give me an example. There would be two different substantive examples and one procedural example. The procedural example is the Corps can go back and do a proper analysis. The substantive examples are the Corps or the Court could order the fill removed. That happens in after the fact permit cases all the time. Substantively, the Corps could also say, you know what, we messed up the analysis here. After we look at these studies, it doesn't look like the compensatory mitigation is correct. And so we're going to order more compensatory mitigation on this particular site. In addition, the Corps could do a cumulative impact analysis that affects other permits in this same area that says, you know, this wetland over here did have some cumulative effect, and so we're going to reduce the amount that we're going to allow you to do in the next door development, the 32.92 acres that are already slated for destruction right next door. So in other words, you'd be doing a new cumulative impact analysis with the store clunked onto this land already? You could, indeed, because you would assume that the stream wetland complex that's at the cumulative impacts that should have been evaluated going back more than five years and the 32.92 acres next door that's already slated for destruction. And that cumulative impact analysis could come out with a very significant different result and lead the Corps to require either more mitigation here or more mitigation in other permits in the area. All right. Now, these kinds of I'll call them after the fact mitigation measures, are they there? They are. They are referenced by those cases. There's a whole list of them. And they are also authorized by the statute, the Clean Water Act, and by the regulations, specifically the ones they are authorized by, 33 CFR 3, 32.3 sub G and sub F. Both allow for the Corps to do compensatory mitigation analysis and require more from an applicant. And if the Corps does what it should do and go back and does an independent evaluation here instead of just cutting and pasting, then they might come to a different conclusion. So let me let's go to that. I mean, whenever you say cut and paste, of course, that raises the specter of just sort of a dismissive analysis. But I think the core of your argument is that there is some independent analysis requirement separate and apart from the hard look requirement. So I'm trying to understand exactly where that comes from in the regs. That comes from two places. That is from the Clean Water Act regulations that we've cited in our brief. It comes also from the NEPA regulations that we've cited in our brief. Both of those specifically say the Corps has a duty to independently evaluate and verify the accuracy of the material that it relies on. And that's both a substantive and a procedural requirement that they do that independent evaluation. And it's undisputed that here they did not have anything other than a letter from a Wal-Mart representative that said, we have a geotechnical study. That study shows that it's going to cost all this extra amount. That's why this other site for which the same store had already gotten a permit and which had already been filled with 81,000 cubic yards of fill, that's why that other site is no longer the best site, even though we, Wal-Mart, said in our previous application that it was the only site and this site, which we now want a permit for, was not acceptable. So then we have the further complication that we need to get over, and that is that the regs actually apply to EIS, not to EAs, correct? At least as explicitly stated. The regs say that the requirement in NEPA applies to data received for possible use in an EIS. The precursor to an EIS is an EA. And that's why this Court in Barnes and other cases has said these independent evaluation criteria apply to EAs just like they would to an EIS, because that's what you're doing when you're doing an EAs. You're evaluating, should we do an EIS? The other thing I think that's sort of gotten lost in the briefing here is that if the Corps had gotten the study, the geotechnical study, and the marketing study, and the access issues, if they had gotten those, they could and should have put them out to the public to comment on, and the public could have had input. The public might have been able to identify issues with those studies that Wal-Mart hadn't disclosed or that the Corps didn't even see. That's the whole point of the public process part of NEPA, is to give that kind of opportunity. So how does all that fit in with another regulation, which basically says you accept the applicant's application, unless later, of course, it turns out they were lying or whatever. So how do these regulations intersect with each other? The Corps accepts the application, and then they're required to not blindly accept what's in it, but to ask questions. And they did start that process here. They asked some questions, and they got a letter that said, we have a geotechnical study. And then they stopped doing what they should have done, which is ask more questions, such as, well, who did it? What does it say? What is it based on? How credible is it? Are there other studies that are different? And how is this, the most important one in my mind is, wait, how is this consistent with what you, this same applicant, represented to us in the NIGARD site where you said it was accessible and you could fill it with $81,000 and it was going to be perfectly usable, and you rejected this current site, that fact alone should have caused the Corps to go back and say, we need the studies. We need to take a hard look here. And I submit to you that from a practical matter, this is a classic arbitrary and capricious situation because the Corps didn't have the facts in front of it. It just had statements by the applicant. And they have to have more than statements. I would use it as an analogy. If I had said in our comments to the Corps, I said a lot, but if I had said, we have a study that shows that the study that the applicant is claiming to have is completely bogus and doesn't say what it says, could the Corps deny the permit based just on my statement that we have a contrary study? Of course not. They would have to say, well, we need to look at your study. What does it really show? That's what they should have done to the applicant as well. Well, okay, you say you have a study. What does it really show? And in this particular case, it was particularly bad because they had the same site for the same store already in front of them. So — How would it have made a difference that they had done that? If they had looked at the study, they might have found that the study was not well-founded. They might have found that the study was well-founded. We don't know because they never did the independent evaluation. They might have concluded, you know what, that other site that you've already filled is a practicable alternative, and I submit they would probably need to because there's a legal presumption, and we laid that out in our brief. Because this was still a functional stream wetland complex, even though it was very small at the business park site, it had a legal presumption under the Clean Water Act that other sites were viable, and the Corps has a duty to have clear and convincing evidence to overcome that presumption. Here, they would have had to have these other studies to have clear and convincing evidence, and they didn't have them. They just had a letter. That's all they had. The other thing I would point out, and the Corps tried to focus a lot on this in their brief, the size of the wetland, and they seemed to suggest that the size allowed them to do a lot less. And that is fundamentally at odds with the whole point of the cumulative impact analysis required by the NEPA and the Clean Water Act. The reason we need cumulative impact analysis is because if it's a little tiny wetland and we just keep ignoring little tiny wetlands, we end up with a completely dysfunctional ecosystem because we've not taken into account the cumulative impact of destroying each little wetland. And here, where the wetland was entitled to a legal presumption that this stream wetland complex was not the right place, they absolutely can't reasonably apply that other regulation that suggests, well, you can adjust your evaluation based on size to exclude a proper cumulative impact or to exclude the independently evaluate. And I have to — Do you want to save the remaining time? I would like to. I should point out, there is some irony in the Corps looking at that one adjust the size regulation because it is one of the regulations that also theoretically only applies to the EIS process. But the reality is they both apply to EAs because those are the precursor to the whole process. Thank you. Thank you. May it please the Court. I'm Mark Haig from the Department of Justice representing the Corps of Engineers. And with me at council table is Misty Latcoup from the Corps' District Office. And I guess I would start where we left off talking about this NIGARD site because the thing that gets left out of the discussion is the mitigation that was required for that granted. A different property owner and developer who apparently had a contract with Walmart applied to the Corps for permission to fill 14.9 acres on that site. And in exchange for the permit to do that fill, the Corps required mitigation of 131 acres of protection and restoration of other wetlands. So almost 10 times as many acres of wetlands were preserved as were filled. The NIGARD site wetlands were highly degraded. The hydrology of that site had been significantly altered by the construction of adjacent roads. And the environmental impact statement for that permit, which is in the record, says that the mitigation, that the environmental balancing, we're losing 14 acres, almost 15 acres of degraded wetlands, gaining 131 acres of higher quality wetlands. So then we come to this permit. The fill is for .37 acres of wetlands on a property that's within a planned shopping center where there has already been fill. The site has been disturbed historically. Again, there's mitigation, 1.3, or 3.7 acres of mitigation for the 3. I'm sorry, .37 acres of mitigation for the .37 acres filled. So this notion that we have death by a thousand cuts and the Corps isn't looking at what's important and gradually the wetlands are being whittled away, that's not what the facts are in this case. There's been adequate mitigation. And when you're talking about .3 acres of fill in a watershed, in a sub-watershed, the Skip-Upon-River watershed, that has 3,700, 3,800 acres of wetlands, so you're pointing, talking about .01% fill mitigated, it's entirely reasonable for the Corps to say, these impacts are not significant, we can issue an EA, and this project is in the, we can make the public interest finding for the Clean Water Act. What about his main argument, which is that the Corps just rubber-stamped or just didn't do any really meaningful analysis of the application? The EA reflects a great deal of analysis, and it reflects back and forth from the agency with respect to whether the Nygaard site was an alternative. But to put this in perspective, the question that the Corps has to answer is, are these impacts going to be significant, and is it consistent with the Clean Water Act's public interest determination? The question of whether the Nygaard site was one of two off-site alternatives and three on-site alternatives that the Corps considered. So Nygaard is just one alternative, and the soil geotechnics analysis and the cost analysis associated with that is just one of the basic cases on which the Corps determined that the Nygaard site was not a practicable alternative. There are also problems with road access, and there are problems with the fact that the elevation of the site is low, and it would have to be raised further to put it out of the floodplain. And Craw's argument now that the Corps should have done more to analyze whether this was a viable alternative is particularly ironic, if we're going to talk about irony here, given the fact that Corp's comments to the Corps, Craw's comments to the Corps in the first place were, the Nygaard site is not a good alternative, we don't think that a Wal-Mart should be there, but you need to do more to consider whether it's an alternative or not. So that's kind of — that's gaming the process. That's not — They're trying to use the regulations, I think, to say something more was required than was done, and this goes to the imposition of the so-called independent analysis. Right. And your response to that is what? My response is that the — whatever — the level of independent analysis that the Corps has to do should be commensurate with the likely impacts of the project. And when you have a small project that — where the likely impacts are minimal, or there's no reason to expect that filling 0.37 acres of wetlands within this area that's already been designated for a shopping center and that has previously been partially filled for a shopping center, given the likely — the scale of those likely impacts, the environmental analysis can be commensurate with that. So you're not disputing that the various regulations that they lay out that talk about independent analysis that, with respect to EIS, actually fold back into the EAs as well? Some of them do and some of them don't. The regulation that they cited in their opening brief, which the Court discusses in hints, was the Corps of Engineers NEPA regulation, and they cite a section of that regulation which has since been repealed. It's no longer in the regulation, and that has the language of independently verify information submitted by an applicant in an EA. The specific provisions — most of the specific provisions in the NEPA — the CEQ NEPA regs refer to environmental impact statements. There's one place in — I think it's 1505.6a that refers to environmental documents, and it's not clear whether that's just limited to environmental impact statements or environmental assessments. But the regulations also make this point, both the EPA regs or the NEPA regs, the Corps NEPA regs, and the 404 guidelines, that the scope of the analysis should be commensurate with the level of the impacts. I think one of the other points that was made — and you actually referenced it in passing — was that part of the public interest analysis should have included whether these big-box stores would impact the local businesses, and that wasn't really fleshed out in the response. Does that appear in the analysis? The EA discusses the fact that there will be impacts on local merchants and acknowledges that there will be some negative impacts as well as positive impacts. But without particular analysis as to what that would be? How many jobs? No, that's right. And there, I think the important point is that the Corps' responsibility here is evaluating the impacts of the fill to the wetlands. Local — and are pretty clear that local land-use decisions and zoning decisions are the responsible of the state and local governments. And here, the county, the state, have all issued the necessary approvals. The Corps is not just a general land-use planning agency. And that — you know, to deal with that for every permit for a fraction of an acre for 50,000 or 60,000 permits a year is simply unworkable, impossible. So before argument, you had alerted us that the store was about to open, but you didn't argue that it was — the case was moved. We did not, Your Honor. So you agree with your opposing counsel that the case is not moved? I — It's just an interesting fact. It's an — it's an interesting fact. I think it's — it's rather — It's out there in the ether. Well, I certainly thought that you would want to know. And it's — I think it's relevant — Sure, why not? And it's relevant in terms of remedy here, whether or not the case is moved, because there — I mean, my particular office in the Justice Department frequently, in the context of timber sales, argues to this Court that the trees have been cut, the NEPA analysis is done, there's no point in looking at alternatives because it's done, and this Court tells us, no, it's not moved if it's — unless it's impossible for the Court to provide some relief. And we felt that it was difficult to make the argument that it's impossible here. It is possible that if it were remanded to the agency, the agency could do additional analysis for mitigation. But I would point out on that, CRAW has never challenged the adequacy of the mitigation here. It doesn't talk — it doesn't talk about the mitigation at the Nargide site or at this site, and there's nothing in its brief saying that the mitigation that was ordered here, which has been completed, was inadequate. So you know, talking about alternatives, talking about mitigating for possible future impacts, that's getting — that's pushing it, I think. There was a mention of the impacts from the planned development of the North Coast Business Park, which is adjacent to the North Coast retail area where this permit is located, and the fact that that — the county's plans call for filling of 32.92 acres. And the CORE's EA describes those future impacts, but doesn't analyze them in detail in the cumulative impact statement. And the reason for that is that this is a general conceptual plan. There have been no permit — at the time that this EA was written, there were no specific permit applications from the county to the CORE for that development. The short answer is that there could be remedies beyond tearing down the store, is what you're saying. Well, that's true, too, and I don't think that from an environmental perspective, I would hope that everyone would agree that at this point that it would do more damage to the environment to tear down the store than to leave it be there. But again, you know, in terms of thinking about the remedy, their — the whole crux of their argument is that first the CORE allowed 14 acres to be filled, and now they're going to allow more to be filled. And that argument doesn't take into account the 131 acres of remediation that were connected with that first 14 acres of fill. I see. If there are no further questions, I will sit down. Thank you. Let me start with that last point. The — I think the CORE misconceives our argument here. Our argument is not just about this one specific wetland and this — the mitigation that was or was not done on the Nygaard site. Our argument is the CORE, as a federal agency, cannot simply cut and paste from the applicants' materials. They have a duty to independently evaluate. And Council references a site to a prior form of the Clean Water Act regulations. What we cited, too, in our opening brief was the Hintz Court, which was relying — this Court's decision in Hintz, which was relying on an older regulation. But the newer regulation still incorporates the same requirement. The newer regulation, which is 33 CFR, Part 325, Appendix B, 8F2, says, quote, In all cases, the district engineer should document in the record the CORE's independent evaluation of the information and its accuracy. That's the current regulation. It's still there. This stuff about it somehow being an old regulation, it's not relevant. They adopted a new regulation with the same requirements. And the NEPA regulation, which also requires the same thing, which is 40 CFR, 1506.5 sub is still in place. Let's go back to this business park next door. This is — the test under NEPA is reasonable foreseeability. Is it reasonably foreseeable that the business park next door, which has a master plan, which has specific 32.92 acres slated for development, is that reasonably foreseeable? This Court has repeatedly held you don't have to have a permit application in front of you before something is reasonably foreseeable. If it's just a general concept out there in the ether, that's not reasonably foreseeable. This is not. It's a specific plan with specific mapped destruction. That crosses the threshold. The final point that I would make is, counsel references the EA reflecting back and forth between the CORE and the agency — or between the CORE and the Walmart folks. And that is correct. As I noted, they did ask some questions, but they never got to the independent evaluation and verify accuracy stage. They just asked questions. And you — the whole point of the regulation for that to mean something, for that NEPA and the Clean Water Act regulation of independent evaluation to actually mean something on a broader level for the CORE and any other agency, is that it has to be more than cut and paste. And that's all they did. They never — there's no question. They never got the study or any of the other studies. And I also note with some humor that counsel says the CORE is supposed to look at wetland impacts, not other things. Well, that's interesting because they justified their public interest finding on the basis of other issues such as access and other issues over at the NIGARD site that the applicant claimed now existed. And we briefed these in our reply. Those other issues were never verified. They just were an email and a letter from an applicant representative. But the CORE relied on those. And yet, now they're saying they're only supposed to look at wetlands. I think the fundamental problem here is that this is a small stream wetland complex that managed to survive all the previous depredations, but the CORE is not supposed to say, ah, it's a small one, so we can wash our hands. There has to be some meaning to independently evaluate. Otherwise, there's no reason for that or the NEPA regulations to exist. And here, what the CORE did was simply take the word of an applicant, and that's never acceptable. It would certainly be better for my clients if I could just simply say to the CORE, oh, we've got a study that shows you're going to destroy a living species in its last habitat, but not provide the study, and have a CORE deny a permit. But they can't do that. That's not the law, and it shouldn't be the law. Thank you. Thank you. I'd like to thank both counsel for your argument and briefing this morning. The case just argued, Klatsop v. the Army Corps of Engineers, is submitted and we're adjourned for the morning. Thank you.
judges: Tashima, McKeown, Paez